[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14198

_____

D.C. Docket No. 6:07-cv-00037-JA-KRS

BOBBY A. RALEIGH,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 30, 2016)

Before TJOFLAT, MARCUS and JORDAN, Circuit Judges.

MARCUS, Circuit Judge:

In this capital case, Bobby Allen Raleigh pled guilty to two counts of first-

degree murder for the 1994 killings of Donald Cox and Timothy Eberlin.  A

unanimous jury in Volusia County, Florida, recommended that he be sentenced to death for each homicide, and in 1996 the state circuit court sentenced him to die. The Florida Supreme Court affirmed his death sentences on direct appeal and then on collateral review. Thereafter, the United States District Court for the Middle District of Florida denied Raleigh's petition for a writ of habeas corpus, which included claims that: (1) the state violated Raleigh's due process rights by knowingly presenting false evidence at his sentencing proceeding; (2) the state violated the Due Process Clause and the Eighth Amendment by presenting differing theories about Raleigh's culpability at his sentencing proceeding and at his co-defendant's trial; (3) trial counsel provided unconstitutionally ineffective assistance by opening the door to the admission of Raleigh's co-defendant's tape-recorded confession; and (4) trial counsel provided ineffective assistance by inadequately preparing a mental health expert who testified in mitigation at Raleigh's penalty phase trial. After thorough review, we affirm the judgment of the district court and deny the petition.

## I.

### A. Crime and Sentence

The essential facts are these.[1]  In the early morning hours of June 5, 1994, while at the Club Europe in DeLand, Florida, Domingo Figueroa, Raleigh's cousin, told Raleigh that someone had slapped Raleigh's mother.[2]  Thereafter, Raleigh and Domingo Figueroa confronted Douglas Cox and his brother.  While the four men were talking in the parking lot outside Club Europe, Raleigh's mother ran out of the bar and began screaming at Mr. Cox.  Raleigh took his mother to the car and returned to confront Cox.  After apologizing for his mother's behavior and shaking hands with Cox, Raleigh went to his home to retrieve some firearms.  Raleigh and Figueroa then drove to Cox's trailer.

Raleigh went to the door of the trailer with a gun in his hand.   Ronald Baker answered the door and told Raleigh that Cox was asleep.  Raleigh and Figueroa left, drove down a nearby dirt road, parked, and later returned to Cox's trailer, both carrying firearms.  Raleigh walked to the end of the trailer and shot Cox in the head three times at close range, killing him.  Then, Figueroa and Raleigh shot Tim Eberlin, Cox's roommate, until their guns jammed, whereupon Raleigh beat Mr. Eberlin in the head with the barrel of his gun until Eberlin stopped screaming.  Afterwards, Raleigh and Figueroa drove to Raleigh's home where they burned the

---

[1] We take these facts from the Florida Supreme Court's opinions on direct appeal and in Raleigh's post-conviction proceeding.  See Raleigh v. State, 705 So. 2d 1324, 1326-27 (Fla. 1997) (per curiam) ("Raleigh I"); Raleigh v. State, 932 So. 2d 1054, 1056-59 (Fla. 2006) (per curiam) ("Raleigh II").

[2] Figueroa is Raleigh's first cousin by marriage.  Raleigh's mother, Janice Figueroa, married Figueroa's uncle, Jose Figueroa.

clothes they were wearing during the murders, dumped their remaining bullets into a neighbor's yard, and hid their guns in a secret compartment in Raleigh's car. The police went to Raleigh's house that night and he agreed to talk to them. Raleigh initially denied his involvement in the murders. But after being told that Figueroa had implicated him, he admitted in a taped statement that he had killed both Cox and Eberlin.

The state charged Raleigh with two counts of first-degree murder, one count of burglary, and one count of shooting into a building. On June 6, 1995, pursuant to a plea agreement, Raleigh pled guilty to two counts of first-degree murder, and the state agreed to nolle prosequi the counts of burglary and shooting into a building.

The state elected to seek the death penalty, and Raleigh's penalty-phase trial was conducted in the circuit court for Volusia County, Florida, from August 8 to 15, 1995. Neither the state nor the defense called Figueroa to testify. However, during cross-examination of a state witness, police investigator Lawrence Horzepa, the jury learned of a taped statement that Figueroa had given to Investigator Horzepa on the day of the murders. Initially, through a series of leading questions during cross-examination, Raleigh's counsel asked Horzepa to confirm specific portions of Figueroa's statement. Among other things, defense counsel asked Horzepa whether Figueroa had told him that Figueroa's "Aunt Janice" (Raleigh's

4

mother) had been called a bad name by Cox, and whether Figueroa admitted to owning the safe that contained the guns. On redirect examination, the state introduced Figueroa's entire statement by playing the tape for the jury. Defense counsel did not object. In the tape, Figueroa admitted that he shot Eberlin at Raleigh's direction. Figueroa claimed that he was not sure if his shot hit Eberlin and that, before he fired the shot, Raleigh had already shot Eberlin once.

Raleigh testified on his own behalf at the penalty phase. He described his participation in the double homicide this way:

> I walked into the living room where Douglas [Cox] was laying on the sofa. I called out his name. I called out "Douglas." And when I turned around, I noticed that Domingo had followed me into the trailer, and he had his gun. He had a piece of cloth around his hand, and had his gun on top of it. And he nodded his -- he just nodded his head like -- and at that point I thought this is what he wanted -- wants me to do. I pulled out the gun, and I shot Douglas.
>
> . . . .
>
> I started running out the back door. I thought that Domingo had already shot Timothy [Eberlin]. He was up on the bed screaming. And I went to run out the door, and I seen the flash from Domingo's gun. I noticed he was firing through the door. I stopped at the door. All of a sudden he starts yelling, my gun's jammed. My gun's jammed. Shoot him. Shoot him. I started firing at Timothy. Once my gun jammed up. I don't know if it jammed up or ran out of shells. I don't know what happened to it. I yelled, my gun's jammed, too. And he started yelling, get him, get him. And I don't know what to do. So I started hitting him with the gun.
>
> . . . .

5

I thought I had only hit [Eberlin] at most four times.[3]

Raleigh called nine other witnesses to testify in support of his mitigation case: Dr. James Upson, a psychologist who examined Raleigh prior to trial; Dr. Myrna Garcia, a psychiatrist who met with Raleigh after he had attempted suicide; his mother; his younger brother; his aunt; his girlfriend; a childhood friend; a man who met Raleigh while he was in jail; and a retired minister who also met with Raleigh when he was in jail.

Dr. Upson testified that he met with Raleigh for approximately eleven-and-a-half hours, interviewed Raleigh's mother for approximately one hour, reviewed Raleigh's school and medical records, and conducted twenty tests. Dr. Upson found Raleigh to be of normal intelligence with an IQ of ninety-eight. He testified that Raleigh was a follower who was easily manipulated by others and that Raleigh portrayed some allegiance to Figueroa. Dr. Upson opined that Raleigh fit the criteria for antisocial personality disorder, although he did not clinically diagnose Raleigh with a personality disorder. He added that Raleigh's neuropsychological functions may have been impaired by the consumption of alcohol at the time of the murders, but there was no significant impairment. Ultimately, Dr. Upson concluded that he could not find any statutory mitigators to apply in Raleigh's case except Raleigh's age at the time of the murders (nineteen).

---

[3] This quotation is taken from the trial transcripts, not the Florida Supreme Court's decisions.

At the conclusion of the penalty phase, the jury unanimously recommended that Raleigh be sentenced to death on each first-degree murder count. After the penalty phase but before Raleigh was sentenced, the state proceeded separately to trial against Figueroa. Based on the evidence presented by the state at Figueroa's trial, Raleigh learned that Figueroa had made another statement about his involvement in the crime. According to Figueroa's uncle, the day following the murder, Figueroa told his uncle that he had killed one victim and Raleigh had killed the other. The state introduced this statement at Figueroa's trial and, during its closing argument, contended that it demonstrated Figueroa had formed the intent to kill Eberlin, regardless of whether Figueroa was the one who actually killed him. The state maintained that Figueroa's admission to his uncle, coupled with forensic evidence that two of the three shots that hit Eberlin may have been fired from Figueroa's gun, demonstrated that Figueroa had downplayed his role in the murders when he gave his statement to Investigator Horzepa.

On February 16, 1996, the trial court sentenced Raleigh to death for each murder upon finding that the state had proven five statutory aggravators: (1) Raleigh had committed a prior violent felony (applied to the murders of both Cox and Eberlin); (2) the murders were committed while Raleigh was engaged in a burglary (also applied to the murders of both Cox and Eberlin); (3) the murder of Cox was cold, calculated, and premeditated; (4) the murder of  Eberlin was

7

committed to avoid arrest or effect escape; and (5) the murder of Eberlin was especially heinous, atrocious, or cruel.   The court also concluded that the aggravators outweighed the one statutory mitigating factor that it found -- that Raleigh was nineteen at the time of the crime -- and the fifteen nonstatutory mitigators that Raleigh had proven -- that he (1) was intoxicated; (2) was remorseful; (3) pled guilty; (4) offered to testify against codefendant Figueroa; (5) could probably adjust well to prison life; (6) was a good son and friend to his mother; (7) was a good brother; (8) was a good father figure to his ex-girlfriend's daughter; (9) was born into a dysfunctional family; (10) did not know who had fathered him; (11) had attempted suicide; (12) had low self-esteem; (13) suffered from an adjustment disorder and was antisocial; (14) used poor judgment and engaged in impulsive behavior; and (15) was a follower.

On direct appeal, the Florida Supreme Court affirmed his convictions and death sentences.  Raleigh I, 705 So. 2d at 1331.  Raleigh filed a petition for writ of certiorari with the United States Supreme Court, which was denied on October 5, 1998.  See Raleigh v. Florida, 525 U.S. 841 (1998).

## B. State Post-Conviction Proceedings

Raleigh began his post-conviction attack under Florida Rule of Criminal Procedure 3.851, raising fourteen claims for relief.[4] The state trial court conducted an evidentiary hearing concerning seven of those claims, including three that are germane to this appeal: that trial counsel was ineffective for failing to object to the admission of Figueroa's taped statement; that the State knowingly presented false evidence; and that trial counsel was ineffective for failing to adequately investigate and present mitigation evidence.

At the evidentiary hearing, Raleigh offered the testimony of a second mental health expert, Dr. Ernest Bordini, a clinical psychologist. Dr. Bordini identified the following deficiencies in Dr. Upson's evaluation of Raleigh and in his testimony at the penalty phase:

---

[4] Raleigh claimed: (1) his trial attorneys were ineffective for failing to object to the admission of Figueroa's taped statement; (2) the state knowingly presented false evidence in violation of his constitutional rights; (3) he was denied an adequate mental-health expert, in violation of Ake v. Oklahoma, 470 U.S. 68 (1985); (4) trial counsel were ineffective for failing to adequately investigate and present additional mitigating evidence at the penalty phase; (5) trial counsel were ineffective for failing to discover and remove prejudiced jurors; (6) trial counsel were ineffective for recommending that Raleigh plead guilty to the murder charges; (7) trial counsel were ineffective for failing to object to burglary as an aggravating factor; (8) trial counsel failed to adequately investigate Raleigh's case before recommending that he plead guilty to the murder charges; (9) trial counsel were ineffective for recommending that Raleigh plead guilty based on their prediction about the trial judge's likely sentence; (10) trial counsel were ineffective for failing to object because the trial court did not instruct the jury that Raleigh had no significant prior criminal history; (11) trial counsel were ineffective for advising Raleigh that the judge would impose life if he pled guilty; (12) the state rules preventing Raleigh's post-conviction counsel from interviewing jurors violated his constitutional rights; (13) Florida's capital sentencing statute was unconstitutional facially and as applied because it failed to prevent the arbitrary and capricious imposition of the death penalty; and (14) Raleigh was insane and, therefore, could not be executed.

Dr. Upson (1) was unaware of critical family history and witness statements, yet [Dr. Bordini] admitted that Defendant simply refused to discuss his sexual abuse at the time of the penalty phase proceeding; (2) failed to adequately understand Defendant's behavior before the murders; (3) did not have enough information about domination to adequately testify to it; (4) erred by failing to work with a diagnosis; (5) administered and scored the MMPI test wrong (Dr. Bordini could not replicate the results); (6) failed to administer a formal memory test; and (7) he failed to fully explore the effects of alcohol on Defendant's judgment and motor function on the night of the murders.

Raleigh II, 932 So. 2d at 1061 n. 10 (quoting trial court).  Dr. Bordini diagnosed Raleigh as suffering from a nondescript neuropsychological dysfunction. He determined that three statutory mitigating factors applied: Raleigh was under the influence of an extreme mental or emotional disturbance at the time of the murder; he was nineteen at the time of the crime; and he was acting under the domination and control of Figueroa.

Raleigh's trial counsel -- attorneys Michael Teal and James Clayton -- testified at the evidentiary hearing regarding how they prepared Dr. Upson to testify and their decision to open the door to the admission of Domingo Figueroa's taped statement.  Two state prosecutors also testified at the evidentiary hearing.

On March 24, 2003, the trial court denied Raleigh's post-conviction motion. The Florida Supreme Court affirmed the denial in a written opinion, denying on the merits each of the four claims at issue in this appeal.  Raleigh II, 932 So. 2d at 1067.  First, Raleigh had argued, the state violated Giglio v. United States, 405

U.S. 150 (1972), by knowingly presenting false evidence when it played

Figueroa's taped statement. The Florida Supreme Court found as fact that

"Raleigh ha[d] not established that Figueroa's statement to Investigator Horzepa

was false, much less that the State knew it was false." Raleigh II, 932 So. 2d at

1065. Second, Raleigh had claimed that the state violated his due process rights, as

identified by the Supreme Court in Bradshaw v. Stumpf, 545 U.S. 175 (2005), by

presenting inconsistent "theories" of the case at his penalty-phase trial and at

Figueroa's trial. After surveying the arguments made by the state in each of the

two cases, the Florida Supreme Court denied this claim, explaining:

> [T]he State did not take an inconsistent position as the prosecution did
> in Stumpf. In Figueroa's trial, the State never contradicted the
> position it took at Raleigh's trial regarding Raleigh's culpability. It
> did not change course by seeking to prove that Figueroa, not Raleigh,
> was the principal actor in Eberlin's death. Therefore, the due process
> concerns raised in Stumpf do not apply.

Raleigh II, 932 So. 2d at 1067.

Third, Raleigh had argued that his trial counsel provided ineffective

assistance by opening the door to the introduction of Figueroa's taped statement.

The Florida Supreme Court rejected this claim too, concluding that "[t]he record

establishes that defense counsel made an informed and reasoned, strategic decision

to introduce Figueroa's taped statement after considering the alternatives,"

specifically, the risk that Figueroa would be called to testify live if the taped

statement were not admitted. Id. at 1064-65. Finally, Raleigh had said that his

11

trial counsel were unconstitutionally ineffective for failing to adequately prepare Dr. Upson to testify in Raleigh's defense. In particular, he claimed counsel were ineffective for failing to inform the doctor about the facts of the crime. The Florida Supreme Court denied this claim, concluding that, even assuming counsel's performance was deficient, Raleigh had failed to establish prejudice because he had not demonstrated that "Dr. Upson's testimony would have been more favorable or materially more credible if Dr. Upson had been provided with the[] facts [about the crimes]." Id. at 1063.

## C. Federal Habeas Corpus Proceedings

On November 13, 2006, Raleigh commenced federal habeas corpus proceedings, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Middle District of Florida. In his amended habeas petition, he raised nine claims for relief. In a September 19, 2013 unpublished order, the district court rejected all of Raleigh's claims, only four of which are relevant for our purposes (conveniently labeled Claims One, Two, Three, and Four in Raleigh's amended petition).

As for Claim One -- the Giglio claim -- the district court concluded that the Florida Supreme Court had reasonably found as a fact that the state had not knowingly presented false evidence when it played Figueroa's tape-recorded statement for the jury. As for the second claim -- the Stumpf inconsistent-theories

argument -- the district court concluded that the Florida Supreme Court had not unreasonably applied clearly established federal law in denying the claim.  It also determined that the state court's factual finding that the state had not taken inconsistent positions in the two cases was reasonable, since the state consistently argued in both cases that both Raleigh and Figueroa were involved in the death of Eberlin.

As for Claim Three, the district court concluded that any claim that counsel was ineffective for failing to call Figueroa's uncle to testify was procedurally defaulted because Raleigh had not raised it in state court.  And as for opening the door to admission of Figueroa's tape-recorded statement, the district court agreed with the Florida Supreme Court that counsel had made a reasonable strategic decision.  Finally, as for Raleigh's fourth claim -- that trial counsel had been ineffective for failing to adequately prepare Dr. Upson -- the district court agreed with the Florida Supreme Court that Raleigh had not been prejudiced by any act or omission of counsel.

The district court granted a COA on Claims One, Two, and Three, and we expanded the COA to include the ineffective assistance of counsel claim that was presented in Claim Four.[5] Raleigh presses each of these claims on appeal.

_____

[5] As part of Claim Four, Raleigh also argued that he was denied an adequate mental health evaluation in violation of his due process rights as established in <u>Ake v. Oklahoma</u>, 470

13

## II.

"In reviewing the district court's denial of a 28 U.S.C. § 2254 petition, we 'review questions of law and mixed questions of law and fact de novo, and findings of fact for clear error.'" Ferguson v. Culliver, 527 F.3d 1144, 1146 (11th Cir. 2008) (per curiam) (quoting Nyland v. Moore, 216 F.3d 1264, 1266 (11th Cir. 2000)). We may only review claims encompassed by the COA. Jordan v. Sec'y, Dep't of Corr., 485 F.3d 1351, 1356 (11th Cir. 2007). Because Raleigh filed his federal habeas petition after 24 April 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Ward v. Hall, 592 F.3d 1144, 1155 (11th Cir. 2010).

Under the provisions of AEDPA, if a state court has adjudicated the merits of a claim, we cannot grant habeas relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). "[C]learly established federal law" under § 2254(d)(1) refers to the "holdings, as opposed to the dicta, of th[e Supreme] Court's decisions as of the time of the relevant state-

---

U.S. 68 (1985). As we explain below, however, Raleigh was never granted a COA on the Ake claim and, therefore, it is not before us today.

court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). "Under §

2254(d)(1)'s 'contrary to' clause, we grant relief only 'if the state court arrives at a

conclusion opposite to that reached by [the Supreme] Court on a question of law or

if the state court decides a case differently than [the Supreme Court] has on a set of

materially indistinguishable facts.'" Jones v. GDCP Warden, 753 F.3d 1171, 1182

(11th Cir. 2014) (alteration in original) (quoting Williams, 529 U.S. at 413).

"Under § 2254(d)(1)'s 'unreasonable application' clause, we grant relief only 'if

the state court identifies the correct governing legal principle from [the Supreme]

Court's decisions but unreasonably applies that principle to the facts of the

prisoner's case.'" Id. (alteration in original) (quoting Williams, 529 U.S. at 413).

Under § 2254(d)(2), we may grant relief only if, in light of the evidence presented

in the state court proceedings, no reasonable jurist would agree with the factual

determinations upon which the state court decision is based. Brumfield v. Cain,

576 U.S. __, 135 S. Ct. 2269, 2277 (2015).

## III.

### A.  Claim One: Giglio Claim

As we've noted, at Raleigh's penalty phase, the state played a tape-recorded

statement by Figueroa, in which Figueroa initially said that Raleigh had killed both

victims but subsequently admitted to having fired the first shot at  Eberlin.  Later,

at Figueroa's trial, the state argued that Figueroa may have killed Eberlin, and it

15

presented the corroborating testimony of Figueroa's uncle (Raleigh's stepfather), who claimed that Figueroa had confessed to having killed one of the victims.  In closing argument at Figueroa's trial, the state argued that Figueroa "told his uncle the truth" when he admitted to killing one of the victims.  Raleigh asserts that, by presenting Figueroa's taped statement at his penalty phase, the state knowingly presented false evidence in violation of Giglio and his right to due process.  The Florida Supreme Court denied this claim on the merits, Raleigh II, 932 So. 2d at 1065, and, therefore, we review its decision through the deferential lens of § 2254(d).

It is by now almost axiomatic that, "[i]n order to prevail on a Giglio claim, a petitioner must establish [1] that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and [2] that the falsehood was material."  Ventura v. Att'y Gen., Fla., 419 F.3d 1269, 1277 (11th Cir. 2005) (quoting Tompkins v. Moore, 193 F.3d 1327, 1339 (11th Cir. 1999)).  A falsehood is material if there is "any reasonable likelihood" that it could have affected the result.  Id. at 1278 (quotation omitted).  As to the materiality prong, "the proper inquiry . . . is whether the Florida Supreme Court's treatment of [Raleigh's] Giglio claim was contrary to or an unreasonable application of the 'any reasonable likelihood' standard."  Id. at 1279.

16

Raleigh challenges the determination of the Florida Supreme Court. He appears to suggest that the Florida Supreme Court made an unreasonable factual finding when it found that Figueroa's taped statement was not false. And more basically, he argues that the Florida Supreme Court applied the wrong legal standard by requiring him to show that the state knowingly presented false evidence.

To the extent Raleigh offers that the Florida Supreme Court unreasonably found as a fact that the state did not knowingly present false evidence by playing the portion of Figueroa's taped statement that accused Raleigh of killing both victims, we are unpersuaded. See 28 U.S.C. § 2254(d)(2). In order to obtain relief, Raleigh must show that no reasonable jurist would agree with the Florida Supreme Court's factual determination. See Brumfield, 576 U.S. __, 135 S. Ct. at 2277. There are four pieces of evidence relating to who killed Eberlin: First, Raleigh testified that both he and Figueroa shot at Eberlin, and then when their guns jammed, Raleigh beat Eberlin with his gun. Second, the medical examiner who performed an autopsy on Eberlin testified that Eberlin died of three gunshot wounds, but he had also been beaten while he was still alive. In particular, the medical examiner testified that Eberlin had been "beaten over the head quite viciously [at least fifteen times] and had injuries to the head that, in and of themselves, certainly could [have been] fatal." Third, in his taped statement to

Investigator Horzepa, Figueroa said that Raleigh killed both of the victims while Figueroa was outside of Cox's trailer. But later in the tape Figueroa contradicted himself and admitted to shooting at Eberlin. And fourth, at Figueroa's trial, Figueroa's uncle testified that Figueroa told him that he had "killed one" of the victims.

The first three pieces of evidence support a finding that Raleigh killed Eberlin. And the fourth -- Figueroa's statement to his uncle -- is in no way incompatible with the thesis that Raleigh actually killed, or was heavily involved in killing, Eberlin, and that he intended to do so. In short, this record does not conclusively establish who caused Eberlin's death, but it does substantially support the conclusion that Raleigh was responsible for both deaths. Indeed, the medical examiner testified that Eberlin was shot multiple times and viciously beaten by Raleigh "in a very short period of time . . . while [he] was still alive." On this record, reasonable jurists could disagree over whether Raleigh actually killed Eberlin by shooting him and beating him over the head, or whether Figueroa killed him when he shot at him at point-blank range. The Florida Supreme Court's factual finding was not "unreasonable" under § 2254(d)(2). See Brumfield, 576 U.S. __, 135 S. Ct. at 2277.

To the extent Raleigh claims that the Florida Supreme Court applied an incorrect legal standard, we remain unpersuaded. In cases involving the alleged

presentation of false evidence, the Supreme Court has held that it is the "deliberate deception of a court and jurors by the presentation of known false evidence" that is "incompatible with rudimentary demands of justice." Giglio, 405 U.S. at 153 (quoting Mooney v. Holohan, 294 U.S. 103, 112 (1935)). Indeed, all of the cases on which Raleigh relies involved the deliberate presentation of false evidence. See Miller v. Pate, 386 U.S. 1, 6 (1967) ("The prosecution deliberately misrepresented the truth."); Napue v. Illinois, 360 U.S. 264, 265 (1959) (explaining that the question presented "is whether on these facts the failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment" (emphasis added)); Alcorta v. Texas, 355 U.S. 28, 31 (1957) (involving the prosecutor's solicitation of knowingly false testimony from a witness).[6] The Florida Supreme Court's determination that Raleigh had to show that the state knowingly presented false evidence was fully consonant with Supreme Court precedent.[7]

---

[6] Raleigh also cites Gray v. Netherland, 518 U.S. 152, 165 (1996), where the Supreme Court indicated in dictum that there could be a due process problem if "the prosecutor deliberately misled [the defendant]" about what evidence the state intended to present at trial, but not if the prosecutor "just . . . changed his mind over the course of the trial." However, Gray -- which was decided on procedural default grounds -- had nothing to do with the truth or falsity of the evidence presented and, like the other cases cited, reaffirmed that the petitioner must show that the prosecutor deliberately misrepresented the truth to establish a due process violation.

[7] We agree with the district court that Raleigh's Giglio claim also fails because he has not established prejudice. Each of the state trial court's findings that Raleigh has challenged -- that the murder was "cold, calculated, and premeditated"; that Raleigh was the "principal perpetrator in these killings"; that Raleigh was not "under the influence of an extreme mental or emotional disturbance"; and that Figueroa did not "substantially dominate" Raleigh during the crimes --

19

## B.  Claim Two: Inconsistent-Theories Claim

Raleigh also suggests that the state violated his Eighth Amendment rights by arguing at the penalty phase of his case that he was the principal perpetrator of the killings and then arguing at Figueroa's trial that Figueroa was the principal perpetrator and that Raleigh was no more than a "drunken boob."  In particular, Raleigh seizes on the state's closing argument in Figueroa's trial, where the state argued that Figueroa "told his uncle the truth" when he admitted to killing one of the victims.  He claims that allowing his death sentence to rest on a later-contradicted theory of the case violates clearly established law dating back to Furman v. Georgia, 408 U.S. 238 (1972).  The Florida Supreme Court analyzed this claim under the Supreme Court's due process precedents and rejected it on the merits because it found that "the State argued consistently in both trials that Raleigh was a principal actor in the death of Eberlin."  Raleigh II, 932 So.2d at 1066.

On appeal, Raleigh launches two lines of attack:  first, he contends that the state high court made an unreasonable determination of the facts, under 28 U.S.C. § 2254(d)(2), when it determined that the state had not presented inconsistent theories;  second, he says, the Florida Supreme Court misconstrued this claim as

_____

were strongly supported by all the evidence, including Raleigh's motive for the killings and, perhaps most notably, his own admission of his involvement in the murders of Cox and Eberlin.

20

arising under the Due Process Clause, instead of the Supreme Court's Eighth Amendment precedents. Again, we are unpersuaded.

As we have explained already, there is nothing unreasonable about the Florida Supreme Court's finding that the state presented essentially the same version of events in the two cases. In Raleigh's trial, the state conceded in opening statement that Figueroa fired the first shot at Eberlin, but said that Raleigh shot Cox and then shot and beat Eberlin. This account was corroborated by Raleigh's testimony. During opening statement at Figueroa's trial, the state relayed the same version of events. While the state claimed in its closing argument that Figueroa "told his uncle the truth" when he admitted to killing one of the victims, it is not clear what this statement meant. Considering the context in which it was made -- during a discussion of Figueroa's mental state during the murders -- the Florida Supreme Court reasonably interpreted the state's argument as expressing only "that Figueroa's statement to his uncle demonstrated that he had formed the intent to kill Eberlin." Raleigh II, 932 So. 2d at 1066.

Raleigh also claims that the prosecutor's characterization of him as a "drunken boob" during closing argument in Figueroa's trial conflicted with the state's portrayal of him as the cold, calculating leader of the murders at his own trial. However, the "drunken boob" comment was made only in passing and, indeed, contradicts most of what the state said in its closing argument at Figueroa's

trial.  For example, the prosecutor said that Figueroa was a "screaming coward" who, when his gun jammed, called for help, and Raleigh then "c[ame] running into the room and sho[t] until his gun [wa]s spent."  By seizing on the "drunken boob" comment, Raleigh mischaracterizes the state's argument in Figueroa's case.  At Raleigh's trial, the state argued that Figueroa, too, was heavily involved in the murder of Eberlin.  After all, Figueroa helped Raleigh obtain the weapons; Figueroa drove him to and from Cox's trailer; and Figueroa fired the first shot at Eberlin.  And, indeed, nothing said during Figueroa's trial undercut the state's concession in its opening statement that Raleigh killed Cox alone, and then shot at and beat Eberlin.  The Florida Supreme Court reasonably concluded that the state did not present contradictory theories in the two cases.

Second, and perhaps even more basic, Raleigh's inconsistent-theories claim has no foundation in clearly established federal law.  Raleigh insists that the Florida Supreme Court misunderstood his claim as having arisen under the Due Process Clause of the Fourteenth Amendment, rather than from the Supreme Court's Eighth Amendment precedent establishing the need for heightened reliability in capital cases.  On appeal, Raleigh unambiguously disavows any reliance on the Due Process Clause.  And, indeed, as the district court recognized, any claim under the Due Process Clause would be expressly foreclosed by Eleventh Circuit precedent.  In Fotopoulos v. Secretary, Department of

22

Corrections, 516 F.3d 1229, 1235 (11th Cir. 2008), a panel of this Court held that the Supreme Court's most relevant due process precedent -- Berger v. United States, 295 U.S. 78 (1935) -- did not hold that the state may not rely on inconsistent theories in seeking the death penalty against co-defendants in separate trials. Recognizing that his due process claim is a nonstarter, Raleigh insists that he is relying only on the Supreme Court's Eighth Amendment jurisprudence.

Raleigh has recast this claim under the Eighth Amendment, but that does not change its fate. The Supreme Court has never held that a state violates due process or the Eighth Amendment when it presents contradictory theories at separate capital trials.

Nevertheless, Raleigh relies principally on Bradshaw v. Stumpf, 545 U.S. 175 (2005), which was decided seven years after his death sentence became final, to support his Eighth Amendment claim. In that case, Stumpf and Wesley robbed and murdered a woman. See id. at 178-79. Stumpf pled guilty, and the state pursued and obtained a death sentence for him by persuading the state sentencing panel that he "was the principal offender" in the murder. See id. at 178-80 (quotation omitted). Subsequently, Wesley admitted to a jailhouse informant that he had fired the fatal shots. Id. at 180. The state then presented that admission to a jury in seeking a death sentence for Wesley, arguing that he had been the principal offender in the murder. Id. at 180. Stumpf sought federal habeas relief, and the

23

Sixth Circuit vacated his conviction and sentence based on its determination that "prosecutorial inconsistencies between the Stumpf and Wesley cases required voiding of Stumpf's guilty plea." Id. at 186-87. The Supreme Court reversed the Sixth Circuit's grant of habeas relief as to Stumpf's conviction because the precise identity of the triggerman was immaterial to Stumpf's conviction for aggravated murder under state law. Id. at 187. However, the Court remanded the case for the Sixth Circuit independently to consider whether Stump was entitled to relief regarding his death sentence because it was "not clear whether the Court of Appeals would have concluded that Stumpf was entitled to resentencing had the court not also considered the conviction invalid." Id.

Raleigh relies essentially on Justice Souter's concurring opinion, where he explained his view of the claim that the Court had remanded:

> As I see it, Stumpf's argument is simply that a death sentence may not be allowed to stand when it was imposed in response to a factual claim that the State necessarily contradicted in subsequently arguing for a death sentence in the case of a codefendant. Stumpf's position was anticipated by Justice STEVENS's observation 10 years ago that "serious questions are raised when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens," and that "[t]he heightened need for reliability in capital cases only underscores the gravity of those questions ... ." Jacobs v. Scott, 513 U.S. 1067, 1070 (1995) (citations and internal quotation marks omitted). Justice STEVENS's statement in turn echoed the more general one expressed by Justice Sutherland in Berger v. United States, 295 U.S. 78, 88 (1935), that the State's interest in winning some point in a given case is transcended by its interest "that justice shall be done." Ultimately, Stumpf's argument appears to be that sustaining a death sentence in circumstances like

24

those here results in a sentencing system that invites the death penalty "to be wantonly . . . and freakishly . . . imposed." Lewis v. Jeffers, 497 U.S. 764, 774 (1990).

Stumpf, 545 U.S. at 189-90 (Souter, J., concurring). Notably, however, Justice Thomas also concurred in Stumpf, observing that "[t]his Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." Id. at 190 (Thomas, J., concurring).

The purported Eighth Amendment rule that Raleigh tries to draw from Justice Souter's concurrence in Stumpf is not clearly established law for AEDPA purposes, either now or at the time Raleigh's conviction became final in 1998. In the first instance, the distinction Raleigh attempts to draw between a due process challenge to a conviction and an Eighth Amendment challenge to his sentence is misguided. Justice Souter viewed the claim that the Court remanded in Stumpf as a due process claim, not as an Eighth Amendment claim. See Stumpf, 545 U.S. at 188 (Souter, J. concurring) ("I understand Stumpf to claim that it violates the basic due process standard, barring fundamentally unfair procedure, to allow his death sentence to stand in the aftermath of three positions taken by the State . . . ."). In fact, none of the opinions in Stumpf even mentioned the Eighth Amendment, and the question remanded by the majority was whether the prosecutor's conduct "amounted to a due process violation." Id. at 187-88 (majority op.). The long and short of it is that neither Stumpf nor its rationale provides Raleigh with a way

25

around Justice Thomas's observation that the Supreme Court "has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." Id. at 190 (Thomas, J., concurring).

Moreover, the principal support cited by Justice Souter in his concurrence is an earlier dissent by Justice Stevens from a denial of a stay of execution, where Justice Stevens called for the Court to hold that states cannot take inconsistent positions in criminal trials or capital sentencing. See Stumpf, 545 U.S. at 189 (Souter, J., concurring) (citing Jacobs, 513 U.S. at 1070 (Stevens, J., dissenting)). This, too, was an implicit recognition that Stumpf's claim is not clearly established law. The other support cited by Justice Souter -- Berger, 295 U.S. at 88 -- plainly is a due process case on which Raleigh expressly disavows reliance and, in any event, which we have held does not preclude the state from using inconsistent theories in separate capital proceedings. See Fotopoulos, 516 F.3d at 1235. Justice Souter's concurrence in Stumpf cannot and does not show that it is clearly established as a matter of Eighth Amendment law (or, for that matter, due process) that the state may not take inconsistent positions.[8]

---

[8] Raleigh also relies on Johnson v. Mississippi, 486 U.S. 578 (1988), where the Supreme Court held that, where a death sentence rests in part on a prior conviction that has subsequently been vacated, the state must reconsider whether death would have been imposed had the sentencer not considered the prior conviction. Id. at 584-85. To find, based on the Court's holding in Johnson, that the rule advanced by Raleigh was "clearly established" would enable courts to "transform even the most imaginative extension of existing case law into 'clearly established Federal law, as determined by the Supreme Court.'" Nevada v. Jackson, 569 U.S. __, 133 S. Ct. 1990, 1994 (2013) (quoting 28 U.S.C. § 2254(d)(1)).

In short, there was nothing unreasonable about the Florida Supreme Court's rejection of Raleigh's inconsistent-theories claim.

### C. Claim Three: Ineffective Assistance of Counsel Relating to Figueroa's Taped Statement

### 1.

In order to establish a claim for ineffective assistance of counsel under the Sixth Amendment, Raleigh must show that (1) his counsel's performance was deficient and "fell below an objective standard of reasonableness," and (2) the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). For the deficient performance prong of Strickland, we must determine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. at 690. "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." Id. at 689; see also Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (explaining that the "petitioner must establish that no competent counsel would have taken the action that his counsel did take"). "Under Strickland, a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

27

different.'" Porter v. McCollum, 558 U.S. 30, 40 (2009) (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

Moreover, under AEDPA, "[t]he question 'is not whether a federal court believes the state court's determination under the Strickland standard 'was incorrect but whether that determination' was unreasonable -- a substantially higher threshold.'" Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)). Indeed, the Supreme Court has explained that "because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Id. The Supreme Court has further explained that "[t]he standard created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Harrington v. Richter, 562 U.S. 86, 105 (2011) (quotations and citations omitted).

**2.**

Raleigh first claims that his trial counsel's decision to open the door to the admission of Figueroa's taped statement constituted ineffective assistance of counsel. The Florida Supreme Court rejected this claim on the merits, concluding that counsel made a reasonable strategic decision to allow the statement into evidence. Raleigh II, 932 So. 2d at 1064-65. Raleigh offers four reasons why he

28

believes trial counsel unreasonably invited the admission of the recorded statement. None is sufficient to overcome the doubly deferential review owed to the Florida Supreme Court's decision. See Harrington, 562 U.S. at 105.

At the outset, Raleigh argues that trial counsel could not have reasonably believed that Figueroa's taped statement provided any benefit to Raleigh's case. This argument -- which forms the lynchpin of Raleigh's ineffective assistance claim -- is unconvincing. Viewing Figueroa's statement as a whole and in the context of Raleigh's theory of the case as presented at the penalty phase, trial counsel sensibly could have concluded that the taped statement would help spare Raleigh's life. First, the questions that opened the door to the admission of Figueroa's taped statement were important to Raleigh's theory of the case. Raleigh's counsel asked Investigator Horzepa about how Figueroa had described the initial confrontation between Raleigh and Cox -- which started when Raleigh's mother "had been called a bad name" by Cox. Raleigh II, 932 So. 2d at 1057. This fact supported Raleigh's claim that he had not planned the murders ahead of time. Raleigh's counsel also asked Investigator Horzepa to confirm that Figueroa admitted to owning the safe that contained the guns that were used during the murders. Id. This admission supported Raleigh's theory that Figueroa was in control and spurred Raleigh to commit the murders. In fact, Figueroa's statement, as a whole, portrayed the murders as an out-of-control effort to scare Cox, which

29

thoroughly undercut the state's theory that Raleigh orchestrated the murders in order to take over Cox's drug territory. In the statement, Figueroa said that Raleigh had told him he shot Cox because he feared that Cox had a weapon. Moreover, Figueroa insisted the only reason for the murders was that Raleigh "wanted to go over and scare [Cox]" because of "the insults that were thrown at [Raleigh's] mom." Because Figueroa's taped statement was largely consistent with the arguments trial counsel presented at the penalty phase and it undercut the state's depiction of the murders, the Florida Supreme Court reasonably deferred to counsel's broad discretion to invite its admission.

Even setting aside that counsel had a reasonable basis to want the jury to hear the taped statement, Raleigh's claim still would fail. The question counsel faced was not just whether admission of the recorded statement affirmatively benefitted Raleigh, but also whether allowing the jury to hear the taped statement was preferable to running the risk that the state might call Figueroa. Since Figueroa's live testimony could not be controlled, counsel had reason to fear what Figueroa might actually say if he was called to testify. Nevertheless, Raleigh points out that there were pending death penalty charges against Figueroa at the time of Raleigh's trial, making it unreasonable to think that Figueroa would actually testify in Raleigh's case. However, this argument is not fully supported by the record. Raleigh's attorneys testified at the state court evidentiary hearing that

the state had repeatedly made clear to them that Figueroa might testify against Raleigh, and that they feared the state would reach a plea agreement with Figueroa and call him to testify.  In light of what counsel knew, the Florida Supreme Court reasonably determined that counsel's performance did not fall "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.

Third, Raleigh argues, if the state planned to call Figueroa to testify at his penalty-phase hearing, it would have been required to notify Raleigh's counsel that Figueroa was a potential witness and was planning to waive his Fifth Amendment rights, which it did not do.  Therefore, he maintains, counsel could not reasonably have believed that Figueroa would be called to testify.  But the Florida Supreme Court could reasonably have concluded otherwise because -- as far as we can tell -- no provision of Florida law would have prevented the state from either reaching a deal with Figueroa during Raleigh's trial and then calling him to testify, or calling Figueroa to testify as a rebuttal witness.[9]  Finally, Raleigh says, there was no agreement between trial counsel and the state that they would not call Figueroa to testify if the taped statement was admitted, so it was objectively unreasonable to invite introduction of the taped statement in order to keep Figueroa off the stand.  However, the Florida Supreme Court reasonably concluded otherwise.  Trial

_____

[9] Indeed, the only case that Raleigh has cited suggests that the state can add to its witness list at any time, as long as the defendant is given an opportunity to question the witness before he testifies.  See Richardson v. State, 246 So. 2d 771, 775-76 (Fla. 1971) (allowing state to notify defendant on the day before trial that his co-defendant had reached a plea agreement and would be testifying against him).

31

counsel knew that the state was intent on presenting Figueroa's version of events to the jury. In fact, nothing in the record contradicts defense counsel Teal's impression, as revealed in his post-conviction testimony, that "Domingo Figueroa, the co-defendant[,] was waiting in the wings to testify against Bobby. And that was made known to us by the State."

At bottom, Raleigh asks us to second guess trial counsel's decision to invite the admission of Figueroa's taped statement into evidence -- which arguably helped Raleigh rebut the state's theory of the case -- in exchange for reducing the risk that the state would call Figueroa to testify live. "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc). The evidence in the record does not show that "no competent counsel would have taken the action that [Raleigh's] counsel did take," Chandler, 218 F.3d at 1315, let alone that the Florida Supreme Court acted unreasonably when it deferred to counsel's choice. Accordingly, we must defer to the state high court's decision.

### 3.

In his federal habeas petition, Raleigh argued for the first time that his trial counsel were ineffective for failing to call Figueroa's uncle to testify at Raleigh's penalty phase. AEDPA requires that a petitioner exhaust all state remedies before

seeking relief on a federal claim.  See 28 U.S.C. § 2254(b)(1)(A).  Exhaustion

requires a state petitioner to "fairly present federal claims to the state courts in

order to give the State the opportunity to pass upon and correct alleged violations

of its prisoners' federal rights."  Duncan v. Henry, 513 U.S. 364, 365 (1995)

(quotations omitted, alteration adopted).  Exhaustion is a "serious and meaningful"

requirement.  Keeney v. Tamanyo-Reyes, 504 U.S. 1, 10 (1992) (subsequent

history omitted).  The petitioner must have presented the claim in a manner that

affords "the State a full and fair opportunity to address and resolve the claim on the

merits."  Id.  A claim is procedurally defaulted for purposes of federal habeas

review "if the petitioner failed to exhaust state remedies and the court to which the

petitioner would be required to present [the claim] in order to meet the exhaustion

requirement would now find the claim[] procedurally barred."  Coleman v.

Thompson, 501 U.S. 722, 735 n. 1 (1991) (subsequent history omitted).

Raleigh concedes that he failed to exhaust his claim that trial counsel were

ineffective for failing to call Figueroa's uncle to testify by not raising it in state

court.  The Florida state courts would not now consider this claim because Raleigh

did not raise it in his initial post-conviction attack.  See Fla. R. Crim. P.

3.851(e)(2).  This portion of Raleigh's ineffective assistance claim is, therefore,

procedurally defaulted, see Coleman, 501 U.S. at 735 n. 1, and "federal habeas

review of the claim[] is barred unless [Raleigh] can demonstrate cause for the

33

default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice." Id. at 750.  He can do neither.

"[A]n attorney's errors during an appeal on direct review may provide cause to excuse a procedural default; for if the attorney appointed by the State to pursue the direct appeal is ineffective, the prisoner has been denied fair process and the opportunity to comply with the State's procedures and obtain an adjudication on the merits of his claims." Martinez v. Ryan, __ U.S. __, 132 S. Ct. 1309, 1317 (2012).  "[C]ounsel's failure to raise a particular claim on appeal is to be scrutinized under the cause and prejudice standard when that failure is treated as a procedural default by the state courts.  Attorney error short of ineffective assistance of counsel does not does not constitute cause for a procedural default even when that default occurs on appeal rather than at trial." Murray v. Carrier, 477 U.S. 478, 492 (1986).  The Strickland standard for ineffective assistance of counsel governs claims of ineffective assistance of appellate counsel. See Smith v. Robbins, 528 U.S. 259, 285 (2000).  While defendants do not have a constitutional right to the effective assistance of counsel on collateral review, ineffective assistance of counsel in an "initial-review collateral proceeding" can constitute cause and prejudice to excuse a procedural default if the collateral proceeding was the first opportunity the defendant had to raise the procedurally defaulted claim. See

Martinez, 132 S. Ct. at 1318.  In order to establish prejudice to excuse a default, the petitioner must show "that there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation.  Henderson v. Campbell, 353 F.3d 880, 892 (11th Cir. 2003).  The Supreme Court has "expressly rejected [the] contention that a showing of actual prejudice 'should permit relief even in the absence of cause.'"  Murray, 477 U.S. at 494 (quoting Engle v. Isaac, 456 U.S. 107, 134 n.43 (1982)).

In an attempt to excuse his procedural default, Raleigh contends that his state collateral counsel was constitutionally ineffective for failing to raise the claim based on trial counsel's failure to call Figueroa's uncle as a witness and that this ineffectiveness excuses his default.  Florida courts generally prohibit defendants from raising ineffective assistance of counsel claims on direct appeal.  See Lambert v. State, 811 So. 2d 805, 807 (Fla. Dist. Ct. App. 2002).  Thus, Raleigh's Rule 3.851 proceeding constituted an initial-review collateral proceeding, and ineffective assistance by his collateral counsel could potentially provide cause to excuse his procedural default.  See Martinez, 132 S. Ct. at 1318.  However, as we see it, collateral counsel could reasonably have chosen not to raise this claim.  The ineffectiveness claim relating to Figueroa's uncle's testimony directly contradicts Raleigh's Giglio claim, since it is premised on the fact that trial counsel knew about Figueroa's uncle's testimony during Raleigh's trial.  The Giglio claim, in

35

contrast, is grounded in Raleigh's assertion that he only learned of the uncle's testimony when the government presented it during Figueroa's trial. Raleigh's collateral counsel was not unreasonable for failing to present contradictory claims in the same petition. And given the substantial deference that courts must pay to trial counsels' strategic decisions, collateral counsel reasonably could have believed that the Giglio claim gave Raleigh the best chance to win.

Moreover, Raleigh was not prejudiced by his collateral counsel's failure to raise this claim because it was clearly without merit. For the reasons we've discussed already, the result of Raleigh's sentencing proceeding would not have been affected by Figueroa's uncle's testimony that Figueroa had admitted to killing one of the victims. Because Raleigh's underlying ineffective assistance claim was unmeritorious, he was not prejudiced by collateral counsel's failure to raise it. See Smith, 528 U.S. at 285-86. And because collateral counsel's failure to raise this ineffectiveness claim was not itself ineffective assistance of counsel, Raleigh has shown neither cause nor prejudice to excuse his procedural default. See Murray, 477 U.S. at 488.

In the absence of cause and prejudice, Raleigh's procedurally defaulted claim may be reached on federal habeas review only if failure to address the claim would result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750 (quotations omitted). In the capital sentencing context, this requires him to prove

36

that, but for the alleged constitutional error, "no reasonable juror would have found him eligible for the death penalty under [Florida] law." Sawyer v. Whitley, 505 U.S. 333, 350 (1992) (emphasis added). Raleigh has not argued, let alone proven that the failure to excuse his procedural default would result in a fundamental miscarriage of justice. Because Raleigh has not excused the procedural default of this ineffective assistance claim, it cannot provide a basis for federal habeas relief.

But, even if this claim had not been procedurally defaulted, we would still find it without merit. Nothing in the record shows that counsel knew of Figueroa's uncle's statement in time to present it at Raleigh's trial. In fact, Raleigh's Giglio claim is premised on the fact that the government never told trial counsel about Figueroa's uncle's statement. See Routly v. Singletary, 33 F.3d 1279, 1286 (11th Cir. 1994) ("There is no violation of due process resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object"). In his opening brief on appeal, Raleigh faults the district court and Florida Supreme Court precisely for failing to make any "factual finding as to whether Figueroa's statement to his uncle had been disclosed to the defense or whether Raleigh's counsel had been deliberately deceived." And in his reply brief on appeal, he distinguishes Routly, arguing that his counsel did not learn about Figueroa's uncle's testimony at least until after Figueroa's trial. Counsel cannot be deemed ineffective for failing to present what they did not have.

37

## D. Claim Four: Counsel's Failure to Prepare Dr. Upson

### 1.

During the penalty phase, Raleigh presented the testimony of psychologist Dr. James Upson in support of his mitigation case. On cross-examination, the state questioned Dr. Upson extensively regarding his knowledge of certain details about Raleigh's crimes. He admitted that he had not been provided certain information about Raleigh's behavior prior to the murders, that he knew "very little" about the murders, and that the additional information "might" have made a difference in his testimony. Raleigh argues that Dr. Upson's credibility was destroyed when his lack of knowledge about the crimes was exposed, and that trial counsel were unconstitutionally ineffective for failing to better prepare him to testify. The Florida Supreme Court denied this claim on the merits, finding that, even assuming a deficiency in performance, Raleigh had "failed to establish prejudice" because he had not "established that Dr. Upson's testimony would have been more favorable or materially more credible if Dr. Upson had been provided with [additional] facts." Raleigh II, 932 So. 2d at 1063.

In a capital sentencing proceeding, defense counsel has "an obligation to conduct a thorough investigation of the defendant's background." Porter, 558 U.S. at 39 (quotation omitted). However, "the mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not

demonstrate that trial counsel was ineffective for failing to produce that expert at trial." Davis v. Singletary, 119 F.3d 1471, 1475 (11th Cir. 1997). To establish prejudice from a failure to adequately investigate or present mitigating evidence in the capital sentencing context, a petitioner "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." Porter, 558 U.S. at 41. "To assess that probability, we consider 'the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding' -- and 'reweig[h] it against the evidence in aggravation.'" Id. (quoting Williams, 529 U.S. at 397–398).

Raleigh first argues that the Florida Supreme Court applied the wrong legal standard and, therefore, its decision was "contrary to" clearly established federal law. He contends that the prejudice standard employed by the Florida Supreme Court imposed an additional burden on him, and that the court was required to find prejudice "if adequate investigation would have provided corroborating support for a mental health expert's conclusions that were attacked as insufficiently supported." But Raleigh's argument misapprehends the standard applied by the Florida Supreme Court, which held that Raleigh had failed to show that, had counsel provided Dr. Upson with the additional information, his testimony would have been "more favorable or materially more credible." Raleigh II, 932 So. 2d at 1063 (emphasis added). His criticism of this standard is that it ignores the fact that

a defendant is prejudiced when a failure to investigate rendered the expert's conclusions "insufficiently supported." But by asking whether the testimony would have been "materially more credible," the court performed the exact inquiry that Raleigh argues federal law requires. If, as the Florida Supreme Court concluded, Dr. Upson's testimony was not materially affected by counsel's failure to adequately prepare him, it naturally follows that there was no "reasonable probability he would have received a different sentence." Porter, 558 U.S. at 41. Thus, its prejudice inquiry was not contrary to Strickland and is progeny.

Raleigh argues in the alternative that the Florida Supreme Court's prejudice analysis was an "unreasonable application" of Strickland. He identifies six ways in which counsel allegedly failed to adequately prepare Dr. Upson to testify at Raleigh's penalty-phase hearing. Even assuming that these failures occurred and that each of them was objectively unreasonable, the Florida Supreme Court reasonably determined that Raleigh had not sustained any prejudice.

First, Raleigh argues that counsel should have discussed the statement of Ronald Baker with Dr. Upson to help prepare him to testify. At Raleigh's trial, Baker testified that he was at Cox's house the first time that Raleigh came by to see Cox on the night of the murders. He said that Raleigh came to the house waving a gun and was "[r]eal nervous like, couldn't stand still, real cocky"; Raleigh was talking about a drug deal and threatened to shoot other people who

40

were waiting outside; and Raleigh then jumped the fence surrounding the yard and left the area.  Baker further testified that he smelled alcohol on Raleigh's breath and that Raleigh appeared "kind of nervous and wired out," but "he wasn't "falling down drunk" and had no trouble walking or speaking.  The prosecutor cross-examined Dr. Upson about certain aspects of Baker's testimony, and Dr. Upson conceded that he did not know that Raleigh had made threats to Baker and others before the murders.  Dr. Upson said that information "might" have made a difference in his opinion, but that he would have to review it first.  Raleigh seizes on this exchange to argue that, had Dr. Upson been aware of Baker's testimony, Dr. Upson's testimony would have been more credible in the eyes of the jury.

If counsel had discussed Baker's statement with Dr. Upson prior to trial, Dr. Upson would have known that, prior to the murders: Raleigh had been drinking but was not "falling down drunk"; he was nervous and couldn't stand still; he threatened to kill other people; and he was talking about a drug deal.  But Dr. Upson was well aware that Raleigh had been drinking, since he testified that "the record indicate[d] [Raleigh] had been drinking quite heavily."  Raleigh has not explained how the other information conveyed in Baker's testimony -- that Raleigh threatened to kill other people, was nervous, and was talking about a drug deal -- would have made Dr. Upson's testimony materially more credible or favorable or otherwise would have advanced his defense.  This information could not have

41

improved the substance of Dr. Upson's testimony because it uniformly supported the prosecutor's theory that the murder was premeditated and was committed in order to eliminate a rival drug dealer.  Moreover, in spite of extensive cross-examination on this issue, Dr. Upson only said that the information contained in Baker's testimony "might" have affected his opinion.  There is nothing in the record to suggest that Dr. Upson's testimony would have been materially more favorable had he known what Baker witnessed.

Raleigh also faults counsel for failing to discuss the statement of Patricia Pendarvis with Dr. Upson.  But Pendarvis, Baker's fiancé, testified to essentially the same facts as Baker.  She said that she had witnessed Raleigh's interaction with Baker while she was sitting in a car in Cox's driveway.  Raleigh told her that he was supposed to make a "deal" with Cox and that "everything was all about making money."  She testified that he smelled like alcohol but that he wasn't falling down or confused and was able to hop over the gate without difficulty.

Third, Raleigh argues that his counsel unreasonably failed to discuss with Dr. Upson the statement of Andy Bennett, who was Raleigh's girlfriend at the time of the murders and had been with him at Club Europe prior to the murders. However, Bennett did not testify at trial, her statement is not anywhere in the record, and Raleigh does not explain what information she would have relayed to

Dr. Upson.  Raleigh has failed to provide any reason to think that this alleged omission by counsel affected Dr. Upson's testimony.

Next, Raleigh alleges that trial counsel unreasonably failed to discuss with Dr. Upson Raleigh's behavior in the week leading up to the murders.  Dr. Bordini identified certain relevant aspects of Raleigh's behavior in the week leading up to the murders, specifically that Raleigh had felt "increasingly out of control" and asked his mother for help, but she told him to help himself.  Furthermore, Raleigh had "almost nightly alcohol blackouts" beginning in April of 1994, two months before the murders.  After reviewing the entire record, we are satisfied that the Florida Supreme Court could reasonably have concluded that more information about Raleigh's drinking would not have materially affected Dr. Upson's testimony.  Dr. Upson testified about the effects of alcohol on Raleigh on the night of the murders.  When Dr. Upson was asked whether Raleigh killed Eberlin to eliminate a witness, he answered that his "impression [of] the night of the crime was that there had been a considerable amount of ingesting of alcohol, and that other factors may be impacting what happened."   Dr. Upson explained that he was not suggesting that Raleigh "didn't know what he was doing," but that "the record indicate[d] [Raleigh] had been drinking quite heavily."  He ultimately concluded that alcohol "may have impacted [Raleigh's] neuro-psychological function" but that Raleigh "had his behavior under control as far as making decisions."  The jury

43

and the sentencing judge, too, were well aware that Raleigh had been drinking before the murders. The trial court accepted this fact, but found that it did not reduce Raleigh's culpability:

> There is no doubt that Raleigh consumed a great deal of alcohol before the murders. This Court cannot find, however, that his condition was "extreme". He acted too purposefully and competently in getting the guns, going to the trailer, doubling back after encountering Baker, et al, in executing Cox, physically beating Eberlin, and in disposing of evidence afterwards. If Raleigh was under extreme mental or emotional disturbance he would not have been able to accomplish all this. Also, witnesses said while Raleigh was under the influence he was coherent, could carry on a conversation, had no trouble walking, and had no trouble climbing the fence. Finally, the Defendant himself admitted he has developed quite a tolerance for alcohol.

Raleigh I, 705 So. 2d at 1330-31 (quoting trial court).

The remaining information about Raleigh's behavior leading up to the murders would not have materially improved Dr. Upson's testimony or affected the trial court's findings, either. These facts are similar to Raleigh's excessive drinking in the days before the murder in that they tend to suggest that Raleigh was not in control of his actions prior to or during the murders. But based on Raleigh's conduct on the night of the murders -- his two approaches to Cox's trailer, his execution of both men, and his subsequent cover-up of the murders -- the Florida Supreme Court reasonably could have concluded that knowing more about his alcohol consumption and erratic behavior would not have affected Dr. Upson's

testimony, and that more expert testimony about these factors would not have affected the jury or the sentencing judge.

Fifth, Raleigh faults his trial counsel for failing to discuss statutory mitigating factors with Dr. Upson, and argues that Dr. Upson did not know enough about those factors to provide effective testimony. But this argument is squarely refuted by the record and, in any event, is unmeritorious. The record contains this colloquy with Dr. Upson:

> Q: Are you aware of the statutory mitigating circumstances to be utilized in a death penalty proceeding?
>
> A: Yes.
>
> Q: Did you find any statutory mitigating mental health circumstances to apply in this case?
>
> A: No.

Moreover, the Florida Supreme Court reasonably determined that Raleigh was not prejudiced by any claimed unfamiliarity that Dr. Upson had with the mitigating factors. Dr. Upson's testimony in fact helped to establish many mitigating factors. As the Florida Supreme Court accurately summarized:

> Dr. Upson's testimony helped the defendant establish one statutory mitigator and at least seven of the fifteen nonstatutory mitigators. The statutory mitigator was Raleigh's age -- he was nineteen at the time of the crime. The nonstatutory mitigators Dr. Upson's testimony helped to establish were: [Raleigh] (1) was intoxicated; (2) was remorseful; (11) attempted suicide; (12) had low self-esteem; (13) suffered from an adjustment disorder and was antisocial; (14) used poor judgment and engaged in impulsive behavior; and (15) was a follower.

Raleigh II, 932 So. 2d at 1062 n. 14.

Sixth and finally, Raleigh argues that counsel unreasonably failed to ask Dr. Upson to make a clinical diagnosis of Raleigh pursuant to the Diagnostic and Statistical Manual of Mental Disorders ("DSM IV"). In contrast, Dr. Bordini made a clinical diagnosis of Raleigh because, he explained, that is the standard practice in the field of psychiatry. However, the Florida Supreme Court could reasonably have concluded Dr. Upson's testimony would not have been materially different had he made a clinical diagnosis. Indeed, Dr. Upson's testimony covered all of the same areas as Dr. Bordini's clinical diagnosis. As part of his diagnosis, Dr. Bordini found that Raleigh was suffering from a cognitive disorder, which he described as "neuropsychological dysfunction . . . directly related to developmental factors and frequent Freon inhalation." In contrast, Dr. Upson testified that he performed "a number of" neuropsychological tests, and "most of them turned out to be very negative, that is to say there [were] no problems evident." Therefore, Dr. Upson simply reached a different diagnosis than Dr. Bordini. Raleigh has provided us with no reason to think that this conclusion would have been affected had counsel requested a diagnosis pursuant to the DSM IV.

Dr. Bordini also determined in his diagnosis that Raleigh had a borderline personality disorder that would have made him impulsive, underassertive, and a follower. Dr. Upson testified that Raleigh exhibited all of these characteristics,

46

although not under the guise of a clinical diagnosis.  For example, he stated that "when complexity hits [Raleigh], when he's overcome by situational stress, he falls apart," and that can lead him to make "bad judgments."  Similarly, Dr. Garcia, the psychologist who treated Raleigh after his suicide attempt, testified that Raleigh had "a lack of impulse control and poor judgment."  Dr. Upson also said that Raleigh was "somewhat insecure," "feels inferior at times," "tends to lean and depend on others," and  has "responded in the past very much in terms of his perception of the needs and wants of others."  And, he opined, Raleigh is "a passive dependent person" who "is easily manipulated by others" and is often unaware that he is being manipulated.  Because Dr. Upson's testimony, as actually presented during Raleigh's penalty phase, essentially covered all of the same areas as Dr. Bordini's clinical diagnosis, the Florida Supreme Court could reasonably have determined that Dr. Upson's testimony would not have been materially different if he had performed a clinical diagnosis.

## 2.

Raleigh offers two additional arguments regarding Dr. Upson's testimony. First, he asserts that Dr. Upson's neuropsychological testing was less accurate than Dr. Bordini's, and that Dr. Upson should have determined that Raleigh had a neuropsychological disorder.  Second, he says that Dr. Upson's testimony concerning the "age" statutory mitigating factor was inadequate.  Dr. Upson said

47

that Raleigh was 19, and therefore qualified for the factor, whereas Dr. Bordini went into greater detail about how Raleigh acted much younger than his age.

These arguments all relate to Dr. Upson's adequacy as a mental health expert, not to any act or omission by counsel. In his state collateral proceeding, Raleigh raised a claim arising under Ake v. Oklahoma, 470 U.S. 68 (1985), where the Supreme Court held that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a "State provide access to a psychiatrist's assistance on [the issue of sanity] if the defendant cannot otherwise afford one." Id. at 74. Under Ake, "the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Id. at 83.

The Florida Supreme Court denied Raleigh's Ake claim because it was procedurally defaulted -- it had not been raised on direct appeal and did not fall within Florida's narrow exception to the procedural bar. See Raleigh II, 932 So. 2d at 1060-62. The district court agreed that the claim was procedurally defaulted and determined that Raleigh had not provided a basis to excuse his procedural default. Moreover, it found that Raleigh's Ake claim was unmeritorious because, "[f]rom Dr. Upson's testimony, it is clear that [Raleigh] was provided a competent mental health examination to assist in evaluation, preparation, and presentation of

48

his defense."  Raleigh sought a Certificate of Appealability on his Ake claim from this Court, which was denied.  The only question relating to Dr. Upson's testimony on which a COA was granted was:

> Whether Raleigh was denied the effective assistance of counsel at trial because counsel failed to adequately prepare Raleigh's mental health expert to testify at the penalty phase of trial.

This is the only question that we may consider on appeal.  See Jordan, 485 F.3d at 1356.

The long and short of it is, the Florida Supreme Court's denials of Raleigh's claims were neither contrary to nor an unreasonable application of clearly established federal law, nor were they based on an unreasonable determination of the facts.

**AFFIRMED.**