[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 24-10739

Non-Argument Calendar

————————————————

LARRY FELTON WHITE, JR.,

Petitioner-Appellant,

*versus*

SECRETARY, DEPARTMENT OF CORRECTIONS,
FLORIDA ATTORNEY GENERAL,

Respondents-Appellees.

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:20-cv-01384-HES-MCR

_____

Before JILL PRYOR, NEWSOM, and GRANT, Circuit Judges.

PER CURIAM:

Larry White, Jr., a Florida prisoner serving a life sentence for second-degree murder, appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. After careful consideration of the parties' briefs and the record, we affirm.

**I.**

White, a Black man, had a strained relationship with his next-door neighbor, Kevin Drew, a white man. One morning in January 2006, White returned home after running errands. He says that when he exited his car, Drew approached him, yelled racial epithets at him, threatened to kill him, and punched him in the face. White then pulled out a gun and pointed it at Drew. White chased Drew approximately 175 feet onto a neighbor's property and shot him three times. By the time emergency personnel arrived on the scene, Drew had died from the gunshot wounds.

After the shooting, White was charged in Florida state court with second-degree murder. In this section, we review the proceedings in White's criminal case. We then discuss his direct appeal, his post-conviction proceedings in Florida state court, and his habeas proceedings in federal court.

### A.

In his first state criminal trial, a jury convicted White of second-degree murder. But a Florida appellate court reversed the conviction because the trial court erred in instructing the jury on manslaughter, a lesser-included offense. *White v. State*, 16 So. 3d 1004 (Fla. Dist. Ct. App. 2009).

While awaiting retrial, White moved to dismiss the charges against him. He argued that he was immune from prosecution because he was justified in using deadly force under the version of Florida's Stand Your Ground law in effect at the time of the shooting. *See* Fla. Stat. § 776.032 (2006) ("A person who uses force as permitted in s. 776.012 . . . is justified in using such force and is immune from criminal prosecution . . . . As used in this subsection, the term 'criminal prosecution' includes arresting, detaining in custody, and charging or prosecuting the defendant."). At that time, § 776.012 provided that a person was "justified in the use of deadly force and d[id] not have a duty to retreat" if he "reasonably believe[d] that such force [was] necessary to prevent imminent death or great bodily harm to himself . . . or another or to prevent the imminent commission of a forcible felony." *Id.* § 776.012 (2006). White argued that the charge against him should be dismissed because at the time of the shooting he reasonably believed that deadly force was necessary to prevent Drew from causing him imminent death or great bodily harm or committing a forcible felony.

After an evidentiary hearing, the state trial court denied White's motion to dismiss. After weighing the evidence from the

hearing, it concluded that White had not shown by a preponderance of evidence that he was justified in using deadly force to defend himself.

In September 2014, the case proceeded to a second trial. A few months before the second trial, Florida amended its Stand Your Ground law to add a provision that a person is justified in using deadly force only if he "is not engaged in a criminal activity and is in a place where he . . . has a right to be" at the time he uses that force. *See* 2014 Fla. Sess. Law Serv. Ch. 2014-195, § 3 (West).

At trial, White argued that he was entitled to immunity because at the time of the shooting, he reasonably believed that it was necessary to use deadly force to keep Drew from causing him great bodily harm or death or committing a forcible felony. The State asserted that White was not entitled to immunity for two reasons. First, at the time of the shooting, Drew had retreated and thus no longer posed an imminent threat to White. Second, at the time of the shooting White had trespassed on his neighbor's property and thus was not in a place where he had a right to be. We now discuss the evidence introduced at trial in more detail.

At trial, the State called a number of witnesses including Drew's girlfriend, his sister, several police officers who investigated the shooting and earlier incidents between Drew and White, a neighbor who owned the property where the shooting occurred, and a medical examiner who testified about the autopsy of Drew's body.

Several of these witnesses testified about White and Drew's strained relationship. The jury heard about an incident that occurred several days before the shooting when an alarm went off at White's home. Upon learning of the alarm, White came home to find that someone had kicked in his front door and ransacked his home. White told officers who responded to the alarm that he thought Drew was responsible. In addition, Drew's sister testified that two days before the shooting White and Drew had a confrontation. During the confrontation, White brought out a gun and threatened that Drew "would get his." Doc. 12-13 at 81.[1] After that incident, Drew's sister called the police.

Drew's girlfriend and his sister testified about the confrontation between White and Drew that led to the shooting. That morning, they were gathered with Drew and others in the front yard of Drew's home. When White drove up, he jumped out of his car and immediately began to argue with Drew. During the argument, White and Drew both used profanity. White patted the right side of his belt and said, "I got something for you, Big Boy." Doc. 12-12 at 148.

Drew's sister and girlfriend testified that during the confrontation, White pushed Drew in the chest. Drew responded by punching White in the mouth and knocking out one of his teeth.

After Drew punched White, White pulled a gun out of his waistband. Both Drew's sister and his girlfriend described Drew's

---

[1] "Doc." numbers refer to the district court's docket entries.

retreat after White pulled out the gun. Drew turned around and ran away from White toward a neighbor's property. White chased Drew. After Drew fled into a neighbor's fenced backyard, White leaned over the fence, pointed his gun, and shot Drew multiple times. Both Drew's girlfriend and sister testified that after the shooting White waved his gun and smiled. He then told Drew's sister that Drew "shouldn't have knocked out my tooth." Doc. 12-13 at 62.

The State also called a medical examiner who testified about the autopsy performed on Drew's body. She reported that Drew was shot three times and died of the gunshot wounds. She explained that one of the shots was to the back of his head and that the shooter was about 18 inches from him at the time of the shooting.

The neighbor who owned the house where the shooting occurred also testified. She stated that White did not have permission to be on her property at the time of the shooting.

White called several witnesses to testify on his behalf. These witnesses included neighbors who testified that Drew had a reputation for violence. White also called his ex-wife as a witness. She testified that Drew and his family displayed Confederate flags outside their house and that two days before the shooting Drew and

his family called White names and "us[ed] the N word." Doc. 12-14 at 73.[2]

White also called expert witnesses in crime scene reconstruction and forensic pathology who opined about how the shooting occurred. The crime scene reconstruction expert testified, based on the path of the gunshot wounds, that Drew was shot twice in his left side and then once in the back of the head. He opined that when the first shot was fired, Drew's left side was turned toward White. He determined based on blood splatter evidence that the shooting occurred while Drew was climbing over the neighbor's fence. The crime scene expert testified that he could not tell whether Drew's body was turned to the side when the first shot was fired because he was climbing over the fence or because he was taking a fighting posture.

The forensic pathologist testified about the conclusions that could be drawn from the autopsy of Drew's body. Based on Drew's injuries, he testified that Drew was about three to four feet from White when the shooting began and that his left side was facing White. White also elicited testimony from the forensic pathologist that it was possible that Drew was still alive after the second shot and had turned to run away from White.

White testified in his own defense. He described the history of his troubled relationship with Drew. He described one occasion

---

[2] Because White's ex-wife was not home at the time of the shooting, she did not offer any testimony about what occurred during the incident.

when he came home to find that his front door had been kicked open, his house ransacked, and his property stolen. He said that upon returning home, he found Drew lurking along the side of his house.

White also discussed the confrontation that occurred two days before the shooting. White testified that after going on a walk, he encountered Drew. Drew and another man approached White, swearing at him. Drew told White, "I'll fuck you up, n*****", because White had pointed Drew out to the police. Doc. 12-18 at 104. White testified that his ex-wife called the police after this incident. He stated that he was not carrying a gun during this confrontation and denied pulling one out.

White described in detail what happened on the day of the shooting. He explained that in the morning he drove to a corner store. When he returned home, Drew and several other individuals were gathered in Drew's front yard. When White exited his car, Drew and two other men approached him. Drew walked up to White saying, "I'm going to kill you, you fucking n*****." *Id.* at 116.

White begged Drew to calm down, but the conflict escalated. White said that Drew's sister joined the group of men and began yelling, "Kick his ass. Beat his fucking ass." *Id.* at 118. Drew then punched White in the face, and White lost a tooth. White denied pushing Drew before the punch.

White testified that after Drew punched him, he pulled out a gun he was carrying in a holster in his waistband. He admitted

that when he pulled out the gun, Drew ran away from him, and he pursued Drew. White testified that while they were running, Drew turned back to face him and put up his fists. White stated that he fired his gun because he believed that Drew was going to attack him and was in fear for his life.

On cross-examination, the prosecution confronted White with several inconsistencies in his statements about the shooting. The first inconsistency was about what White was doing on the day of the shooting before the confrontation with Drew. Although White testified that he had run to the corner store, when police interviewed him shortly after the shooting, he reported working in the yard for nearly two hours before the confrontation and did not mention driving to a store. Instead, he told police that a friend had used his car that morning.

The second inconsistency was about what Drew said to White before punching him. In the police interview, White said that immediately before the punch, Drew called him a "n*****" and stated he was going to "beat [White's] ass," but White did not mention that Drew threatened to kill him. Doc. 12-20 at 25. At trial, White testified that Drew had threatened to kill him.

The third inconsistency was about whether White was carrying a gun when Drew punched him. White told police after the shooting that after Drew punched him, he ran inside the house and retrieved a gun from the kitchen. But at trial White testified that he was carrying the weapon in a holster in his waistband.

The fourth inconsistency was about the location of the shooting. In the police interview, White initially stated that the shooting occurred in his front yard and denied chasing Drew. But when the police mentioned that they had not found any shell casings in White's front yard, he admitted to pursuing Drew into the neighbor's yard.

At trial, when the State confronted White with these inconsistencies, he said that he had spoken with the police shortly after the shooting. He testified that he had been in shock and had made misstatements to the police because his brain was foggy after the shooting.

Before closing arguments, the court held a charge conference. Both the State and White sought modifications to Florida's pattern instruction about when the use of deadly force is justified. First, the State sought to remove language directing that the imminent commission of a crime could be included as a circumstance that would justify the use of deadly force. The court refused to modify the charge because there was evidence that when White shot Drew, White believed that Drew was going to punch him again.

Second, defense counsel sought to add language to the pattern instruction that the jury could consider Drew's reputation for violence. The court agreed to this modification.

Third, defense counsel asked the court to add an instruction that the jury could consider that Drew was the initial aggressor. The court refused to give this instruction because it concluded that

whether Drew was the initial aggressor was irrelevant to whether White's use of force was justified because there was some evidence that Drew had retreated when White pulled out the gun.

Fourth, defense counsel requested an instruction that Drew's retreat was not a factor for the jury to consider. The court refused to give this instruction, stating that it was confusing.

In its closing, the State argued to the jury that White's use of force was not justified. First, the State argued that even if Drew was the initial aggressor in the conflict, he was no longer a threat to White at the time of the shooting. It explained that when White pulled out the gun, Drew retreated and attempted to run away. The State argued that once Drew retreated, White no longer had a reasonable fear that Drew would cause him great bodily harm or death or would commit an imminent felony.

The State also relied on a second theory about why White's use of deadly force was not justified. It argued that the shooting had occurred on a neighbor's property where White was trespassing. It asserted that White's use of deadly force was not justified because at the moment of the shooting he was engaged in an unlawful activity—that is, trespassing onto his neighbor's property while armed.

In his closing, White argued that the jury should find his use of force justified. He argued that at the moment of the shooting Drew had turned back to face him and re-engaged in the attack, leaving White in fear for his life.

After closing arguments, the court charged the jury. It charged that the issue in the case was whether "the death of Kevin Drew resulted from the justifiable use of deadly force." Doc. 12-22 at 12. It explained that a person was justified in using deadly force and did not commit a crime if he "reasonably believe[d] that such force [was] necessary to prevent . . . imminent death or great bodily harm to himself or another, or . . . the imminent commission of an aggravated battery against himself." *Id.* It added that the use of deadly force was not justified if the jury found that Drew, in good faith, withdrew from the physical contact with White and clearly indicated that he wanted to withdraw and stop the use of force, but White continued to use or resumed the use of force.

The court also instructed the jury that to be authorized to use deadly force, White could not have been committing another crime at the time he used deadly force. It explained that if White "was not engaged in an unlawful activity and was attacked in any place where he had a right to be," then he "had the right to stand his ground and meet force with force including deadly force, if he reasonably believed that it was necessary to do so to prevent death or great bodily harm to himself or to prevent the commission of a forcible felony." *Id.* at 12–13. The upshot of this portion of the instruction was that the jury was told that White was not authorized to use deadly force if he was committing another crime—such as armed trespass—at the time he shot Drew.

The jury found White guilty of second-degree murder. It also found that White possessed and discharged a firearm during

the commission of the offense that caused Drew's death. The trial court sentenced White to life imprisonment.

## B.

White appealed. He raised several issues on direct appeal, including whether the trial court erred in instructing the jury on the justifiable use of force. He argued that the court's jury instructions about Drew's retreat included an incorrect statement of the law and misled the jury. Florida's First District Court of Appeal affirmed without a written opinion.

## C.

White then sought postconviction relief in Florida state court. He filed a motion under Florida Rule of Criminal Procedure 3.850 in state circuit court seeking post-conviction relief. In the motion, he raised several claims, including that his trial counsel was ineffective in failing to object to the jury instruction that White had a duty to retreat if he was engaged in unlawful activity. White explained that at the time of his trial in 2014, the Florida legislature had recently amended the Stand Your Ground law to provide that a person was not justified in using deadly force if he was engaged in unlawful activity when he used the force. Because the version of the law in effect at the time of the shooting did not contain a similar provision, White argued that the court erred in instructing the jury that a person was not justified in using deadly force if he was engaged in an unlawful activity at the time. He argued that his trial counsel rendered ineffective assistance by failing to object to the instruction.

He also argued that he was prejudiced by the erroneous instruction. He pointed out that the State had elicited testimony from the neighbor who owned the property where Drew was shot that White had no permission to enter her property. And in closing arguments, the prosecutor argued that White had committed an armed trespass on the neighbor's property and that his use of force was not justified because he was engaged in unlawful activity at the time of the shooting.

The state post-conviction court denied the Rule 3.850 motion. As to the ineffective assistance claim based on trial counsel's failure to object to the jury instruction about unlawful activity, the court concluded that trial counsel had not been ineffective. It explained that trial counsel had challenged the jury instructions about "retreat and self-defense" and that counsel was not ineffective simply because the trial judge had made an adverse ruling. Doc. 12-37 at 3. White appealed the denial of his Rule 3.850 motion. Florida's First District Court of Appeal affirmed without opinion.

White also filed a petition for habeas corpus in Florida's First District Court of Appeal. He alleged that he received ineffective assistance on appeal because his attorney failed to raise on direct appeal a challenge to the jury instruction regarding justified use of force and unlawful activity. The court denied the petition without an opinion.

## D.

White filed a federal habeas petition pursuant to 28 U.S.C. § 2254. He alleged that he received ineffective assistance of trial

counsel because his counsel failed to object to the jury instruction stating that the use of deadly force is not justified if a person is engaged in unlawful activity. He also claimed that he received ineffective assistance of appellate counsel because appellate counsel did not raise this issue on direct appeal.

The district court denied White's petition. For the ineffective assistance of trial counsel claim, the court concluded that the state court decision rejecting this claim was entitled to deference. The court alternatively determined that even if the state court decision was not entitled to deference, White's claim failed on the merits under *de novo* review.

The court concluded that the ineffective assistance of trial counsel claim failed on the merits because trial counsel's performance was not deficient. The court noted that the instruction White was challenging "was part of the standard jury instruction on the justifiable use of deadly force" and that under Florida law, "standard instructions are presumed to be correct." Doc. 16 at 22. The court concluded that trial counsel did not provide deficient performance by failing "to object to a standard instruction that had not been invalidated by the Florida Supreme Court." *Id.*

For similar reasons, the court concluded that White was not entitled to relief on his ineffective assistance of appellate counsel claim. The court concluded that (1) the Florida appellate court's decision denying White's habeas petition raising this claim was entitled to deference and (2) the claim failed even under *de novo* review because appellate counsel's performance was not deficient.

Although the district court denied White's habeas petition, it granted him a certificate of appealability on the ineffective assistance of trial counsel claim. This appeal followed.

## II.

We review *de novo* a district court's denial of a petition for a writ of habeas corpus. *Morrow v. Warden, Ga. Diagnostic Prison*, 886 F.3d 1138, 1146 (11th Cir. 2018).

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs our review of federal habeas petitions. *See* 28 U.S.C. § 2254(d). "AEDPA prescribes a highly deferential framework for evaluating issues previously decided in state court." *Sears v. Warden GDCP*, 73 F.4th 1269, 1279 (11th Cir. 2023). Under AEDPA, a federal court may not grant habeas relief on a claim that was "adjudicated on the merits in [s]tate court" unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established law if the court "applie[d] a rule that contradicts the governing law" set forth by the United States Supreme Court or the state court confronted facts that were "materially indistinguishable" from United States Supreme Court precedent but arrived at a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). To meet the unreasonable-application-of-law standard, "a prisoner must show far

more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (internal quotation marks omitted). The decision must be "so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). This standard is "difficult to meet and . . . demands that state-court decisions be given the benefit of the doubt." *Raulerson v. Warden*, 928 F.3d 987, 996 (11th Cir. 2019) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)).

We also must defer to a state court's determination of facts unless its decision "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2). "We may not characterize . . . state-court factual determinations as unreasonable 'merely because we would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (alteration adopted) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). We presume that a state court's factual determinations are correct, absent clear and convincing evidence to the contrary. *See Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc).

On each claimed basis for relief, we review "the last state-court adjudication on the merits." *Greene v. Fisher*, 565 U.S. 34, 40 (2011). If the last state court to render a decision did so without opinion, we must "look through" it to the last related state court decision that provided reasoning and presume that the higher state

court implicitly adopted it. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

## III.

The United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel includes the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To establish ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's performance was deficient and (2) he was prejudiced by the deficient performance. *Id.* at 687. A court deciding an ineffective assistance claim need not "address both components of the inquiry if the [petitioner] makes an insufficient showing on one." *Id.* at 697.

White asserts that he received ineffective assistance of counsel at trial when his counsel failed to challenge the jury instruction stating that a person was not justified in using deadly force if he was engaged in illegal conduct at the time he used deadly force. As a refresher, the court instructed the jury that a person was authorized to use deadly force only if he "was not engaged in an unlawful activity and was attacked in any place where he had a right to be." Doc. 12-22 at 12–13. White argues that his counsel performed deficiently in failing to challenge this portion of the instruction because under the version of Florida's Stand Your Ground law in effect at the time of offense, a person could use deadly force if he "reasonably believe[d] that such force [was] necessary to prevent imminent

death or great bodily harm to himself." Fla. Stat. § 776.012(1) (2006). As Florida courts have recognized, this version of § 776.012 permitted the use of deadly force even if the person who used deadly force also was committing a crime such as trespassing on someone else's land. *See Eady v. State*, 229 So. 3d 434, 437 (Fla. Dist. Ct. App. 2017) (recognizing that this version of § 776.012 did not bar the use of deadly force simply because a person was engaged in an unlawful activity). Florida courts have also recognized that the later version of the Stand Your Ground law—that barred a person committing an unlawful activity from using deadly force—applies only to "conduct [that] occurred after the legislature's 2014 amendment" went into effect. *Id.* at 438. White says that his trial counsel was ineffective in failing to challenge the court's jury instruction because it applied the wrong version of Florida's Stand Your Ground law.

Here, we need not decide whether the state court decision rejecting this ineffective assistance claim is entitled to deference because even if this claim was "eligible for *de novo* review, it would still fail." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1291 (11th Cir. 2012) (explaining that, even when it is clear that AEDPA deference applies, we may affirm the denial of federal habeas relief based on *de novo* review). White's claim fails under *de novo* review because he failed to establish prejudice.

To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. That is, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Richter*, 562 U.S. at 104 (internal quotation marks omitted). Instead, "[c]ounsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* (internal quotation marks omitted omitted).

We assume for purposes of our prejudice analysis that if White's counsel had objected to the jury instruction, the state trial court would have removed the portion of the instruction stating that a person who is engaged in unlawful activity is not authorized to use deadly force. It is true that without this instruction, the jury could not have found that White's use of force was unjustified based on the fact that at the time of the shooting he was committing an armed trespass onto his neighbor's property. *See* Fla. Stat. § 810.09 (making it a felony to trespass onto another's property while "armed with a firearm"). Even so, White cannot show a reasonable probability that the jury would have found that Drew's death resulted from the justifiable use of force.

After all, the jury still would have been instructed that the use of deadly force was not justified if White used force after Drew withdrew from the physical contact and clearly indicated that he

wanted to withdraw and stop the use of force. The evidence here showed that once White drew his weapon, Drew ceased physical contact and clearly indicated that he wanted to withdraw and stop the use of force by running away from White. Despite Drew's withdrawal, White chased Drew approximately 175 feet until Drew came to a neighbor's fence. When Drew slowed down to cross the fence, White shot him multiple times at an extremely close range, including once in the back of the head.

White says that this analysis is flawed because when Drew was at the fence, he stopped fleeing and engaged again in physical combat with White. White did, in fact, offer this testimony. But his account of the events widely diverges from the other eyewitnesses, who did not report seeing Drew re-engage with White. And even assuming that White is correct that Drew's body was turned to the side when the shooting began, White's own expert admitted that Drew's body could have been turned because he was climbing over the neighbor's fence, not because he was beginning to attack again. After reviewing the entire record, we cannot say that there is a reasonable probability that the jury's verdict would have been different if White's trial counsel had objected to the jury instruction addressing unlawful activities.[3] Accordingly, the district court did not err in denying White's habeas petition.

---

[3] In his appellate brief, White also argues that the district court erred in denying his ineffective assistance of appellate counsel claim related to the same jury instruction. But a petitioner has a limited right to appeal from the denial of a

22                        Opinion of the Court                    24-10739

**AFFIRMED.**

_____

habeas corpus petition and must obtain a certificate of appealability by making a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The certificate of appealability identifies the issues that justify appellate review to ensure that "[t]he decision about which issues are to be considered . . . [is] made on the front end of an appeal, before the issues are briefed." *Hodges v. Att'y Gen., State of Fla.*, 506 F.3d 1337, 1340 (11th Cir. 2007).

In his appellate brief, White raises the issue whether the district court erred in denying his ineffective assistance of appellate counsel claim. But we cannot consider this issue because the district court did not grant him a certificate of appealability on it, and he never filed a motion in our Court to expand the certificate of appealability. *See Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 963 (11th Cir. 2016) (recognizing that as a general matter we are limited to review on appeal only those issues for which the prisoner received a certificate of appealability).

White suggests in his appellate briefing that we should expand the certificate of appealability to cover the ineffective assistance of appellate counsel claim. But a petitioner granted a certificate of appealability on one issue may not "simply brief other issues as he desires in an attempt to force both the Court and his opponent to address them." *Dell v. United States*, 710 F.3d 1267, 1272 (11th Cir. 2013); *see Tompkins v. Moore*, 193 F.3d 1327, 1332 (11th Cir. 1999) (explaining that a motion to expand a certificate of appealability "must be filed promptly, well before the opening brief is due" and that "[a]rguments in a brief addressing issues not covered in the certificate . . . will not be considered as a timely application for expansion of the certificate; those issues simply will not be reviewed"). It is true that in an "extraordinary case" a merits panel may expand a certificate of appealability. But we are not persuaded that this appeal presents an extraordinary case. *See, e.g.*, *Dell*, 710 F.3d at 1272–73 (concluding that extraordinary case exception applied in case where prisoner initially proceeded *pro se* on appeal but this Court later appointed counsel and directed appointed counsel to submit a brief addressing expanding the certificate of appealability).